John B. Bulgozdy (Pro Hac Vice Pending)
bulgozdyj@sec.gov
Teri Melson (Pro Hac Vice Pending)
melsont@sec.gov
U.S. Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, CA 90071
Tel:  323-965-3998

Amy J. Oliver (8785)
olivera@sec.gov
U.S. Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, Utah 84101
Tel:  801-524-5796

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES THOMAS BRAMLETTE; THE PELORUS GROUP, LLC; ANTHONY MARK HARTMAN; PRIVATE PLACEMENT CAPITAL NOTES II, LLC; STONE MOUNTAIN EQUITIES, LLC; TRAVIS KOZLOWSKI; ENTELECUS FUND, LLC; AARON JOHN WERNLI,<br><br>Defendants. | **COMPLAINT**<br><br>Case No.: 2:18-cv-00761-PMW<br><br>Magistrate Judge: Paul M. Warner |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendants James Thomas Bramlette ("Bramlette"); The Pelorus Group, LLC ("Pelorus"); Anthony

1

Mark Hartman ("Hartman"); Private Placement Capital Notes II, LLC ("PPCN"); Stone Mountain

Equities, LLC ("SME"); Travis Kozlowski ("Kozlowski"), Entelecus Fund, LLC ("Entelecus"); and

Aaron John Wernli ("Wernli") (collectively, "Defendants") alleges:

## INTRODUCTION

1.      Beginning in January 2014, Defendants Bramlette, Hartman, Kozlowski, and Wernli

made numerous misrepresentations to investors, omitted material information, and perpetrated a

complex fraudulent scheme using the Melrose Resort, a decrepit property located on Daufuskie

Island, South Carolina.  Bramlette, the ringleader of the fraud, arranged the purchase of the Melrose

Resort out of bankruptcy in 2011, and managed the property through at least 2016.  Beginning in

January 2014, Defendants raised over $10.8 million from at least 60 investors, through the offer and

sale of promissory notes, for the ostensible purpose of funding the Melrose Resort.  Defendants

materially misrepresented the financial condition of the Melrose Resort to investors, and failed to

disclose material information, including a November 2013 foreclosure action by a lender owed

more than $20 million secured by the properties making up the Melrose Resort; an April 2014

judgment in that foreclosure action in excess of $27 million; and a series of loans from another

lender culminating in Bramlette and Hartman losing their ownership of the Melrose Resort, and of

their companies Pelorus, PPCN, and SME, in May 2015.

2.      In addition to their misrepresentations and omissions, Defendants engaged in a

fraudulent scheme designed to cover up their conduct.  Bramlette and Hartman negotiated a series

of deals so that they could continue to market the Melrose Resort even after its foreclosure, and

used their continued management of the Melrose Resort to deceive investors about the status of the

project and their investments.  As part of the scheme, Hartman and PPCN provided false account

statements and investment updates to PPCN investors, and lulled investors into believing their

investments were performing, even though PPCN had lost its interest in the Melrose Resort, its

single largest asset.  Defendants Hartman, PPCN, and SME made Ponzi-like interest payments to investors, which concealed that PPCN had no earnings and insufficient assets.  Even after losing all interest in the Melrose Resort, Pelorus, PPCN, SME, and Entelecus, Defendants continued to use the Melrose Resort to try to deceive investors and raise additional funds.  Defendants Bramlette, Hartman, and Kozlowski profited from the scheme by, among other things, misappropriating investor funds to pay for their personal expenses.

3.      By this conduct, Defendants Bramlette and his company Pelorus, Hartman and his companies PPCN and SME, Kozlowski and his company Entelecus, and Wernli violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act").  In addition, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, and Entelecus violated Section 17(a)(2) of the Securities Act.

4.      The SEC seeks findings of fact and conclusions of law establishing the violations, permanent injunctive relief, disgorgement of the ill-gotten gains of Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, and Entelecus with prejudgment interest thereon, and civil penalties against Defendants.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

6.      Defendants, directly or indirectly, singly and in concert, have made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this

complaint.

7.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the

transactions, acts, practices and courses of conduct alleged in this Complaint took place in this

district and because certain of the defendants reside in and transact business in this district.

Bramlette, Pelorus, Kozlowski, Entelecus, and Wernli all reside in the district.  Hartman, PPCN,

and SME did business in this district, including partnering with Bramlette and Pelorus, sending

investor funds to Pelorus, and obtaining loans from businesses in this district.  Hartman and PPCN

were also members of Melrose Holdings, LLC ("Melrose Holdings"), a Utah limited liability

company headquartered in this district.

## THE DEFENDANTS

8.     Bramlette, age 40, who is referred to as "JT," is a resident of Sandy, Utah, and the

founder and sole owner of Defendant Pelorus.  Bramlette was associated with companies named Nu

Way Development, LLC; Nu Way Partners; and Nu Way, LLC, from around 2005 until they all

ceased operation in 2008.  On April 4, 2008, Bramlette filed for personal bankruptcy under Chapter

11 of the Bankruptcy Code.  Also in 2008, Bramlette became a member and manager of Foreclosure

Investment Group, LLC, and F.I.G. Holdings, LLC, which were both Utah limited liability

companies.  Between 2008 and 2011, Bramlette was also involved in several other Utah limited

liability companies, including Puravida Soco, LLC; The Villas at Altura, LLC; The Arling Group,

LLC; 603 Deer Valley Drive, LLC; 2867 West Deer Pointe Drive, LLC; and The Kanton's at

Midway, LLC.  Beginning in 2011, Bramlette was the majority owner and manager of Melrose

Holdings, which in turn owned a majority interest of F.I.G. Daufuksie I, LLC; F.I.G. Beach Club,

LLC; and F.I.G. Beach Cottages, LLC.  In November 2011, Bramlette formed as owner and

manager a company named Daufuskie Embarkment, LLC.  Bramlette also owned a company named

Daufuskie Management, LLC.  Bramlette has never been registered with the SEC in any capacity.

9.     Pelorus is a limited liability company formed in Utah on April 23, 2009 with its principal place of business in Salt Lake City, Utah.  According to its website, Pelorus specializes in luxury lifestyle hotels and residential private club communities throughout North America.  Pelorus is not registered with the SEC in any capacity.

10.     Hartman, age 58, is a resident of Plano, Texas.  Hartman is the founder, sole owner, and manager of PPCN and SME.  From March 2008 through April 21, 2011, Hartman was a registered investment adviser and was associated with various registered broker-dealers.  In June 2012, Hartman consented to a bar from the Colorado Division of Securities for activity as an unlicensed sales representative and investment adviser.  Since April 2011, Hartman has not been registered with the SEC in any capacity.

11.     PPCN is a limited liability company formed in Colorado on December 21, 2008 with its principal place of business in Greenwood Village, Colorado.  PPCN was formed for the purpose of making or participating in "bridge loans" to borrowers and all activities related thereto.  Prior to PPCN, in July 2006 Hartman formed a company named Private Placement Capital Notes I, LLC, which he merged into PPCN in June 2010.  PPCN was owned and managed by Denver Financial Group, Inc., a Colorado corporation, which was wholly-owned by Hartman.  On March 4, 2009, PPCN filed a Form D exemption from registration with the SEC, which it amended on June 25, 2010.  In or about October 2012, PPCN became a minority owner of Melrose Holdings.

12.     SME is a limited liability company formed in Nevada on June 5, 2001 with its principal place of business in Denver, Colorado.  SME engaged in the business of issuing short term promissory notes with high guaranteed rates of return.  SME is a subsidiary of PPCN.  SME is not registered with the SEC in any capacity.

13.     Kozlowski, age 38, is a resident of Draper, Utah.  Kozlowski is the founder and owner of Synergy Capital Management, LLC, based in Salt Lake City, Utah, which is a business advisor and real estate investing business.  Kozlowski is also the founder and owner of Entelecus Management, LLC, which manages Defendant Entelecus.  Kozlowski works in the Pelorus office, and the Pelorus website identifies Kozlowski as a partner responsible for "investor relations" and "an investor and advisor for a number of the firm's private real estate and private equity projects." Kozlowski also owns and operates a number of companies that have "Synergy" in their name, and other companies, such as Melrose Boat, LLC.  Kozlowski has never been registered with the SEC in any capacity.

14.     Entelecus is a limited liability company formed in Utah on August 5, 2010 with its principal place of business in Draper, Utah.  Entelecus is a holding company for Synergy Capital Management, LLC, and Synergy Lending, LLC.  It is not registered with the SEC in any capacity.

15.     Wernli age 39, is a resident of Centerville, Utah.  Wernli has worked with Bramlette since at least 2004, most recently as "Director of Acquisitions" for Pelorus.  The Pelorus website identifies Wernli as "one of the company's original partners" who was responsible for overseeing the Melrose Resort.  Prior to working at Pelorus, Wernli worked as a construction manager for one of Bramlette's prior companies, Nu Way Development, LLC.  Wernli has never been registered with the SEC in any capacity.

## FACTUAL ALLEGATIONS

### A.     Defendants Are Long-time Business Associates

16.     Defendants Bramlette, Hartman, Kozlowski, and Wernli have been in business together, in one form or another, for many years.

17.     Bramlette and Wernli have been business partners for about 15 years.  At Pelorus, Wernli was responsible for supervising the day-to-day operations of Pelorus and the Melrose

Resort.  At times, Wernli served as a co-guarantor with Bramlette on loans.

18.     Bramlette and Kozlowski began working together around April 2011.  Prior to his involvement with Bramlette and the Melrose Resort, Kozlowski was involved in another Bramlette project referred to as Deer Crest – a project in which PPCN also invested.

19.     In or about May 2008, Hartman and PPCN began participating in several loans to entities associated with Bramlette through a company called Gateway Capital Partners, LLC ("Gateway").

(a)     Between 2008 through at least 2010, Hartman and PPCN participated, through Gateway, in loans to several Bramlette-associated entities, including:  Puravida Soco, LLC; The Villas at Altura, LLC; The Arling Group, LLC; 603 Deer Valley Drive, LLC; The Kanton's at Midway, LLC; 2867 West Deer Pointe Drive, LLC; and Foreclosure Investment Group, LLC.

(b)     By 2010, several of PPCN's participation interests in loans to Bramlette-associated entities did not pay off on time or in full.  In an effort to hide the losses, Hartman and Gateway transferred the deficit from non-performing loans into the terms of a new loan.

(c)     In or around late 2012, Bramlette and Gateway organized Melrose Holdings and gave PPCN a minority interest in the company, in return for PPCN's contribution of its interest in several of the Bramlette-associated loans in which it had participated through Gateway.

20.     Although Hartman had been investing in Bramlette-associated projects since 2008, Hartman and Bramlette claim to have never met, spoke, or communicated directly with each other until in or around January 2013.

21.     Bramlette and Hartman claim that they first met face-to-face in or around February 2013.  At that point in time, Hartman and PPCN were already partners with Bramlette in Melrose Holdings.

**B.      Defendants Obtained and Used the Decrepit Melrose Resort to Bilk Investors**

22.     The Defendants raised money from investors using a collection of properties known as the "Melrose Resort."  Located on Daufuskie Island, off the coast of South Carolina, the Melrose Resort consists of several properties, including:  (1) Melrose Club, (2) Melrose Inn, (3) Melrose Beach Club, (4) Melrose Beach Cottages, (5) Daufuskie Embarkment, which included a waterfront dock, shed, and convenience store, and (6) staff housing, undeveloped commercial tracts, and open space.

       **1.      Bramlette initially purchased the Melrose Resort properties at inflated prices and with no money down**

23.     The prior developer of the Melrose Resort had shuttered the operation in or around 2008, and filed for bankruptcy in 2009.  The various properties were in disrepair when, in May 2011, Bramlette began purchasing parcels of the Melrose Resort.

24.     Beginning in May 2011, Bramlette began purchasing parcels of property that made up the Melrose Resort at inflated prices, and with no money down.  Bramlette structured the deals so that one of his business associates purchased the properties, and then resold them to Bramlette's entities at an inflated price.  Bramlette obtained financing based on the inflated price, thus purchasing the properties with no money down.

25.     First, in or about May 2011, a company named Daufuskie North I, LLC, paid $8.5 million to purchase the Melrose Club, which it sold on the same day to Bramlette's company, F.I.G. Daufuskie I, LLC, for $13 million.

       (a)     Bramlette obtained an $11 million mortgage loan from a lender, hereinafter "Senior Lender," which provided all the cash used for the transaction, and Daufuskie North I, LLC, took back a $2 million promissory note from F.I.G. Daufuskie I, LLC.

       (b)     Daufuskie North I, LLC, was owned and controlled by a business associate of

Bramlette.

      (c)     Bramlette thus acquired the Melrose Club without any capital investment by Bramlette, and his business associate received an immediate cash profit of over $2 million.

      (d)     Bramlette agreed to pay back to the Senior Lender the entire $11 million principal, and interest at 12% per year, just three months later, on August 6, 2011, in a single balloon payment.

26.     Second, in or about December 2011, a company owned by one of Bramlette's business associates acquired seven parcels on Daufuskie Island for $3.3 million, including the Melrose Beach Club and Melrose Beach Cottages, and Bramlette then acquired those properties from his business associate for total consideration of $7.2 million.

      (a)     F.I.G. Beach Club, LLC, a company created and controlled by Bramlette, purchased the Beach Club property for $4.2 million, and F.I.G. Beach Cottages, LLC, a company created and controlled by Bramlette, purchased the beach cottage properties for $3 million.

      (b)     Bramlette financed these purchases with two more mortgage loans from the Senior Lender totaling $5.45 million.  One loan for $2.25 million made to F.I.G. Beach Cottages, LLC, with interest charged at 12% per year, was due and payable in a single balloon payment due June 2012.  A second loan for $3.2 million to F.I.G. Beach Club, LLC, with interest charged at 12% per year, was due in a single balloon payment due in May 2012.  These loans were secured by a cross-default agreement with the $11 million loan from the Senior Lender.

### 2.     PPCN obtained an interest in Melrose Holdings

27.     In or about October 2012, Bramlette formed Melrose Holdings, to allow Gateway and PPCN to invest in the Melrose Resort, through Melrose Holdings' ownership.

28.     Bramlette contributed to Melrose Holdings his interests in F.I.G. Daufuskie I, LLC, F.I.G. Beach Cottages, LLC and F.I.G. Beach Club, LLC, and in two other Daufuskie entities he

owned, Daufuskie Embarkment, LLC and Daufuskie Investment Management, LLC (hereinafter the "Daufuskie Entities").

29.     In return for a minority interest in Melrose Holdings, PPCN contributed the interests it had purchased through Gateway in loan participations in certain Bramlette-associated companies.

30.     The operating agreement for Melrose Holdings, effective as of October 2012, stated that Bramlette personally owned 34% of Melrose Holdings; Gateway owned 34% through another company; and PPCN owned 32% of Melrose Holdings.

31.     The operating agreement for Melrose Holdings provided that Bramlette and the officers of Gateway were managers of Melrose Holdings.  PPCN and Hartman were not given any managerial role in the October 2012 operating agreement.

32.     An amended operating agreement (effective on or about December 31, 2013) later divested Gateway of any interest in Melrose Holdings.  Bramlette personally owned 58.75% of Melrose Holdings and became the sole manager, while PPCN retained a minority interest of 41.75% of the Melrose Holdings.

### 3.     The Senior Lender declared a default in June 2013 but agreed to a loan modification, and properties were sold in a tax sale

33.     As of June 2013, the Senior Lender declared three loans in default:  (1) the F.I.G. Daufuskie I loan for $11 million; (2) the F.I.G. Beach Club loan for $3.2 million; and (3) the F.I.G. Beach Cottages loan for $2.25 million.

34.     Bramlette negotiated a modification of the loans, which had a combined outstanding principal and interest due, as of February 9, 2013, of $20,524,142.66.  Under the terms of the modification, the interest rate on the loans was increased to 16% per annum, and the maturity dates were extended to August 9, 2013.

35.     As part of the modification, the Senior Lender provided another $1.2 million in

financing to a new entity, Daufuskie Embarkment, LLC, owned by Bramlette.  The loan to

Daufuskie Embarkment was due on August 9, 2013, in the amount $2,666,666.50, which

represented principal and interest.

36.     The modification agreement required the borrowers, Bramlette and Hartman, to

contribute no less than $225,000 in cash into the Melrose Resort project each month beginning on

May 31, 2013.  The agreement expressly required cash, and not value of time or services provided.

37.     The modification agreement also required the borrowers to satisfy outstanding

mechanic's liens attached to the Melrose Resort properties within thirty days.  The outstanding

mechanic's liens identified in the agreement totaled over $350,000.

38.     In October 2013, several of the Melrose Resort properties were sold at a tax sale for

failure to pay 2012 property taxes, although the taxpayer had one year from the date of the tax sale

to redeem the properties.

**4.     The Senior Lender foreclosed in November 2013 and redeemed the tax sale**

39.     The various properties comprising the Melrose Resort continued to be in disrepair in

late 2013, when the Melrose Resort went into foreclosure and properties were sold in a tax sale.

40.     In or around October 2013, the Senior Lender gave notice of default under the terms

of the modified loan agreements to F.I.G. Daufuksie I, LLC; F.I.G. Beach Club, LLC; F.I.G. Beach

Cottages, LLC, and Daufuskie Embarkment, LLC, and provided Bramlette, as borrower and

guarantor, an opportunity to cure.

41.     Bramlette was not able to cure the default.

42.     In or around November 2013, the Senior Lender filed an action to foreclose and a

motion for appointment of a receiver over all the cross-collateralized Melrose Resort properties,

because the borrowers had defaulted on the loans.  In an accompanying affidavit, a representative of

the Senior Lender averred that the properties "are in a state of disrepair and are being poorly

managed."

43.     In April 2014, the Senior Lender obtained a judgment in foreclosure for over $27 million against, among others, F.I.G. Daufuksie I, LLC; F.I.G. Beach Club, LLC; F.I.G. Beach Cottages, LLC; Daufuskie Embarkment, LLC; Daufuskie North I, LLC; and Bramlette.

44.     Bramlette negotiated with the Senior Lender to continue to manage the properties. The Senior Lender agreed to hold the foreclosure in abeyance in return for payment of $100,000 each month, which did not go towards principal or interest on the loans.

45.     In October 2014, the Senior Lender paid over $880,000 to redeem the properties that had been sold in a tax sale in October 2013.

**5.     By January 2014, the Melrose Resort was a failing enterprise**

46.     Beginning no later than January 2014, the Melrose Resort was a failing enterprise without sufficient capital to pay its bills.  Throughout 2014 through 2017, bills for basic items such as utilities or taxes were unpaid and past due, such that the power was shut off and parcels were sold to pay back taxes.

47.     Beginning in January 2014 and continuing through 2017, the need to find money to pay the daily bills was a regular topic of communication among Bramlette, Kozlowski, Hartman, and Wernli.

48.     During the period beginning no later than January 2014, Bramlette, Hartman, Kozlowski, and Wernli regularly exchanged emails discussing the financial problems with Melrose Resort and the inability to pay bills.  Examples of some of the correspondence are:

(a)     On or about Friday, January 31, 2014, Bramlette communicated to Kozlowski and Hartman that because of past due balances and unpaid bills, the power for the Melrose Resort was going to be shut off on the following Monday morning.

(b)     On or about February 4, 2014, Bramlette, Kozlowski, and Hartman

exchanged an email in which Bramlette stated that he did not have the funds to fly to New York to meet with an investor, but Hartman assured him that he had $250,000 coming in from an investor which could be used to pay some of the overdue bills.

(c)     On or about June 1, 2015, Hartman emailed Bramlette on the subject of "status update on inbound capital," to inform him that a client was selling securities to invest with PPCN, and Hartman expected to have roughly $250,000 in ten days, with another $350,000 coming in shortly thereafter.  Hartman wrote that he was aware that there were a number of obligations that were due, including payroll, but that if Bramlette could cover the critical expenses over the next ten days, then Hartman expected to have some capital to cover expenses.

(d)     On or about August 8, 2015, Bramlette forwarded an email to Kozlowski and Hartman from a Daufuskie employee with the subject "Yikes," in which he was informed that the power had been cut off, suggesting that employees who live in off-island housing should be sent home, that payroll was due, the ferry would be shut off, and trash collection had been shut off.  The Daufuskie employee suggested that Bramlette might just want to shut everything down until he figured out his refinancing.

(e)     On or about September 15, 2015, after being informed that two checks to pay for services had been returned for "NSF" (non-sufficient funds) and a money order would need to be tendered to restore services to the island, Bramlette emailed Hartman and Kozlowski asking for someone "to come through" with money to pay the bills.

(f)     On or about January 14, 2016, Bramlette forwarded to Hartman and Kozlowski an email listing overdue bills, including food service, ferry service, liquor license, heating oil, and payroll.

(g)     On or about February 5, 2016, Bramlette was informed that the water

company had shut off all the water to the Melrose Resort and needed $33,000 to turn it back on. Bramlette typed an expletive and forwarded the email to Kozlowski and Hartman.

(h)     On or about February 11, 2016, Wernli emailed Kozlowski and Hartman to inform them that Bramlette had been working all night "hitting everyone up for capital," "we have the repo guys showing up tomorrow and the Ferry Passes are shut off" so they could not reach Daufuskie Island, and insurance on another piece of property was being canceled the next day.

(i)     On or about May 24, 2016, Bramlette forwarded to Hartman an email which outlined the total indebtedness to the Senior Lender as of April 9, 2014, which was $27,540,856.51. Bramlette also included an October 13, 2014 Consent Amendment to the Master's Decree and Judgment of Foreclosure, which increased the total indebtedness by $1,143,146.19 as a result of the Senior Lender paying real estate taxes to purchase back the properties which had been sold in a tax sale.

(j)     On or about September 20, 2016, Wernli sent an email to Bramlette with the subject "Taxes," which Bramlette forwarded to Hartman and Kozlowski.  In the email, Wernli informed Bramlette that unless taxes in the total amount of $502,759.40 were paid by September 30, 2016, then the properties would go up for sale on October 3, 2016.  When he forwarded the email, Bramlette commented:   "Just a head's up.  I have no idea how to deal with this."

49.     Throughout the period from January 2014 through 2017, Bramlette, Hartman, Kozlowski, and Wernli were each aware of the dire financial situation facing the Melrose Resort.

**6.     Bramlette and Hartman mortgaged and lost ownership of Melrose Holdings, Pelorus, PPCN, and SME**

50.     In October and November 2014, Bramlette, Pelorus, Hartman, PPCN, and Melrose Holdings, LLC, and its subsidiaries, entered into two loan agreements secured by their interests in, among other assets, Melrose Holdings.

51.     In or about October 2014, Bramlette, Pelorus, Hartman, PPCN, Melrose Holdings, and their affiliates borrowed $400,000 from Mezz II, LLC, a Utah limited liability company ("Mezz II").  Among the security provided by the borrowers was the assignment to the lender of all right and title in Melrose Holdings, with a right to redemption of all but 3% upon full repayment.  The loan was due on January 22, 2015.  Bramlette and Hartman each personally guaranteed the loan. (This loan is hereafter referred to as the "Mezz II Loan.")

52.     In or about November 18, 2014, Bramlette, Pelorus, Hartman, PPCN, Melrose Holdings, and their affiliates borrowed $300,000 from North Shore Investments, LLC, a Utah limited liability company ("North Shore"), which was secured by 20% of all the collateral pledged in the Mezz II Loan.  The loan was due on January 22, 2015.  Bramlette and Hartman each personally guaranteed the loan.  (This loan is hereafter referred to as the "North Shore Loan.")

53.     Bramlette, Hartman, and their entities were unable to repay the Mezz II Loan and the North Shore Loan when they came due.  They negotiated a one-month forbearance in return for a payment of $200,000, and Hartman pledged his membership interests in PPCN, SME, and two other entities he owned.  The loans were due on February 22, 2015.

54.     Bramlette, Hartman, and their entities were unable to repay the Mezz II Loan and North Shore Loan.  On February 22, 2015, they negotiated a second forbearance to April 8, 2015.

55.     Bramlette, Hartman, and their entities were unable to repay the Mezz II Loan and the North Shore Loan on April 8, 2015, and negotiated a third forbearance to May 31, 2015.  As consideration for the third forbearance, Bramlette and PPCN relinquished all ownership of Melrose Holdings, Bramlette assigned to the lenders his ownership in Pelorus and two other entities, and Hartman assigned to the lenders his ownership in PPCN and SME and two other entities, subject to redemption if the loans were paid in full on May 31, 2015.

56.     In addition, Bramlette and Hartman executed a Verified Confession of Judgment, under which they jointly and severally confessed to a judgment in the amount of $1.455 million.

57.     The Mezz II Loan and North Shore Loan were not repaid in full on May 31, 2015.

58.     No additional forbearance agreements were negotiated between the borrowers and the lenders.

59.     On or about December 15, 2015, the lenders filed an action and verified confession of judgment in Utah state court captioned *Mezz II, LLC, et al., v. James T. Bramlette, et al.* ("Mezz II Litigation").  On December 17, 2015, the court issued a Final Judgment finding Bramlette and Hartman in default on their obligations and entering a judgment in the amount of $3,994,885 against Bramlette and Hartman, which remains unpaid.

60.     In connection with the Mezz II Litigation, the plaintiffs retained an expert to value PPCN's assets.  The expert's report, dated August 25, 2016, opined that the Melrose Resort "is insolvent and the PPCN interest in the Melrose Property is negative $6.2 million."  With regard to PPCN's other two large investments, Emvation (valued by Hartman at approximately $5.2 million), and Good Earth Minerals (valued by Hartman at about $2.9 million), the expert opined that the Emvation note was worth "$180,000 at most," and that PPCN's interest in Good Earth Minerals "is worth no more than $780,000."

61.     On or about August 29, 2016, Hartman and Bramlette entered into an agreement which assigned all of North Shore's claims to yet another lender, ACP South Carolina, LLC ("ACP"), which then became the lawful owner of Pelorus and Melrose Holdings.  On the same date, Hartman, Bramlette, Mezz II, and ACP entered into a Loan Modification Agreement which required that the Melrose Resort be refinanced with at least $20 million in new capital by December 31, 2016, and retained ACP's lien on all assets of PPCN and SME.

16

62.     As of December 31, 2016, Bramlette and Hartman failed to obtain $20 million of new financing for the Melrose Resort.

      **7.      The Melrose Resort properties were sold in foreclosure**

63.     On or about February 6, 2017, the Senior Lender sold the Melrose Resort properties in the foreclosure action for a credit bid.

64.     On or about February 7, 2017, certain of the properties were sold for failure to pay 2016 county property taxes.

65.     On March 7, 2017, in an effort to forestall the foreclosure sale, the borrowing entities filed petitions for bankruptcy.  At the instruction of ACP, Bramlette signed each of the bankruptcy petitions.  The petitions for bankruptcy did not identify PPCN as having any interest in any of the bankrupt entities, and it was not identified as a creditor of any of the Daufuskie Entities.

**C.      Defendants' Fraudulent Conduct**

66.     By January 2014, Hartman, Bramlette, Kozlowski, and Wernli were well aware of the dire financial condition of the Melrose Resort and Hartman's inability to pay investors in PPCN, many of whom Hartman knew had invested their retirement funds.  Although Hartman, Bramlette, Kozlowski, and Wernli were well aware of the financial problems that the Melrose Resort was experiencing, they continued to solicit investors after January 2014 without any viable source to repay the investors, and without any disclosure to investors about the dire financial condition of the Melrose Resort.  In fact, Hartman solicited investors in PPCN to purchase promissory notes from SME, without any disclosure of the dire financial condition of Melrose Resort, thus compounding the investors' losses, and with complete disregard for the truth.

67.     During the period from January 2014 through mid-2017, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli each made material misrepresentations, and omitted to state material facts, to investors about the Melrose Resort and its

financial condition, in connection with the offer and sale of securities in the form of promissory notes.

68.     From January 2014 through mid-2017, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, engaged in a fraudulent scheme to raise money from investors based on the financially failing Melrose Resort, which they knew was in dire financial condition and was subject to tens of millions of dollars in senior liens they could not pay.

69.     Through their fraudulent conduct, defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli collectively raised over $10.8 million from investors during the period from January 2014 through mid-2017, including (1) at least $6.7 million raised by Hartman; (2) at least $1.8 million raised by Bramlette; (3) at least $1.8 million raised by Kozlowski; and (4) at least $425,000 raised by Wernli.

**1.     Defendants Made Material Misrepresentations, and Omitted to Disclose Material Facts, to Investors**

70.     From January 2014 through mid-2017, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli made misrepresentations, and omitted to disclose material facts, in a variety of written and verbal statements to investors, including, *inter alia*, in emails, promissory notes, an offering memorandum, by telephone, and during in-person meetings, as specified and illustrated by the examples below.

**a.     Hartman's material misrepresentations and omissions**

71.     From January 2014 through at least October 2016, Hartman raised at least $6.7 million from at least 37 investors through promissory notes issued by PPCN, or its subsidiary, SME, for the purpose of investing in the Melrose Resort.

72.     The money Hartman raised from investor notes issued by PPCN and SME was pooled in bank accounts controlled by Hartman, and then sent to bank accounts controlled by

Bramlette, where it was pooled with investor money raised by the other Defendants, to be used for the Melrose Resort.

73.     Hartman signed the promissory notes issued by PPCN.

74.     Hartman signed the promissory notes issued by SME.

75.     From January 2014 through at least October 2016, Hartman encouraged investors to use their IRA and retirement funds to purchase promissory notes issued by PPCN and SME, by falsely claiming that the investments in Melrose Resort were "safe."

76.     In making such claims, Hartman omitted material information concerning the dire financial condition of the Melrose Resort which made the investments highly risky, material information that PPCN had not generated sufficient profits to pay the promised returns to investors, material information about the October 2013 tax sale, material information about the November 2013 foreclosure action, material information about the April 2014 judgment in the foreclosure action for $27 million, material information about PPCN's loss of its interest in Melrose Holdings, and material information about Hartman's loss of ownership of PPCN and SME.

### i.     The PPCN material misrepresentations and omissions

77.     By January 2014, PPCN owed its investors approximately $48 million, according to its December 31, 2013 financial statements.  Hartman valued PPCN's assets at about $54.8 million, and its financial statements identified its three largest investments as:  (1) "Dafuskie Melrose Holdings," valued by Hartman at about $38.8 million, (2) Emvation, valued by Hartman at approximately $5.2 million, and (3) Good Earth Minerals, valued at about $2.9 million.

78.     In view of the foreclosure action initiated by the Senior Lender in November 2013 on the properties associated with the Melrose Resort, and the other financial problems, Hartman's valuation of "Daufuskie Melrose Holdings" at about $38.8 million as of December 31, 2013, was inflated.  As of December 31, 2013, PPCN was facing catastrophic losses on its Daufuskie Melrose

Holdings investments.

79.     After January 1, 2014, Hartman provided potential investors in PPCN with a private placement memorandum dated May 15, 2010 ("PPM").  Hartman directed the distribution of the PPM to investors and potential investors in PPCN, using means and instrumentalities of interstate commerce, including emails.

80.     Hartman was responsible for and approved the contents of the PPM.  The PPM offered securities in the form of promissory notes that would pay up to 12.5% per year in interest. The PPM described the promissory notes issued by PPCN as having a five-year term, with interest payable every six months.  Investors were offered the option of receiving their interest payments in cash, or re-investing the interest payments to increase the principal amount of their notes.

81.     The PPM disclosed that investors' money would be pooled to make "commercial hard money loans, referred to herein as 'Bridge Loans,' or other permitted investments as described below."  The PPM stated that PPCN also planned to make other investments, such as "equity investments in distressed real estate, equity or debt investments in loans taken over by the FDIC, and investments in apartments or other income producing properties."  The PPM stated that PPCN "does not intend to engage in any other business activities, although it reserves the right to do so if [PPCN] identifies an opportunity that it believes will provide [PPCN] with a return on investment and risks that are similar to those for Bridge Loans."

82.     The PPM stated that financial statements would be provided to investors at their request.

83.     The 2010 PPM included "Exhibit C," described as a "summary of [PPCN's] investment history."  Exhibit C was prepared as of 2010, identified about $14.9 million of investments, and failed to identify any investment in Melrose Holdings or Daufuskie Island.

84.     Hartman and PPCN solicited investors using means and instrumentalities of interstate commerce, including through telephone and email communications, and in face-to-face meetings with investors, by paying other investment advisers to refer potential investors to PPCN, and through free dinner seminars.

85.     Hartman solicited investors located in Colorado, Arizona, Nebraska, Texas, Nevada, and Michigan.

86.     In connection with the offer and sale of notes in PPCN beginning as of January 1, 2014, Hartman made material misrepresentations concerning the financial condition of PPCN and its performance, and failed to disclose material information about PPCN to investors.

87.     Hartman falsely claimed that PPCN was earning returns of 12.5% per year and that the Melrose Resort was making progress, and failed to disclose material information that the Melrose Resort was in severe financial distress, had gone into foreclosure and the Senior Lender had obtained a judgment for over $27 million, part of the property had been sold in a tax sale, PPCN was facing catastrophic losses because the Melrose Resort was its largest asset which Hartman valued in excess of $38 million on its financial statements, and PPCN was not earning returns of 12.5% per year because of the Melrose Resort catastrophe.

88.     Hartman made these material misrepresentations and omissions to prospective PPCN investors on a regular basis in the course of communicating with investors in an effort to convince them to invest, at or around the time each of them invested.  Hartman made these misrepresentations and omissions both verbally and in written materials.  Examples of these misrepresentations and omissions include the following:

89.     For example, Hartman solicited a couple to invest in PPCN in or around April and May 2014, and the investors purchased a $165,000 promissory note from PPCN on or about May

29, 2014.  Hartman made the following material misrepresentations, and omitted to disclose the following material information, to those investors in connection with the offer and sale of the PPCN promissory note:

(a)      Prior to the investor couple's purchase, Hartman provided them with a document dated January 2014, titled "PPCN II 2013 Year End Update."  The Update included a glowing description of the Melrose Resort and called it a "trophy asset."  The Update omitted material information about the November 2013 foreclosure action on the Melrose Resort and the tax sale of a portion of the property.

(b)      Prior to the investor couple's purchase, Hartman provided them with a document purporting to provide a side-by-side comparison of compounding of PPCN compared to the S&P 500, which showed that PPCN earned 12.5% per year and substantially outperformed the S&P 500.  The side-by-side comparison was materially misleading because PPCN did not earn 12.5% per year prior to January 1, 2014, and omitted material information concerning that PPCN was facing catastrophic losses on its investment in Melrose Resort.

(c)      In or about May 2014, prior to the investor couple's purchase, Hartman falsely stated PPCN had $4.50 in asset for every $1 invested, which materially misrepresented the financial condition of PPCN based on the December 31, 2013 financial statements which listed assets of approximately $55 million and liabilities to noteholders of about $48 million, and omitted material information that those assets were overstated because of, among other things, the financial disrepair of the Melrose Resort, the November 2013 foreclosure on the Melrose Resort and tax sale of a portion of the property.

90.      For example, in or around October 2014, Hartman sold a $100,000 promissory note in PPCN to an investor, and then later that month, attempted to obtain additional money from the

investor by falsely claiming that a $100,000 investment in PPCN "earns $35.32 every single day. This turns into $12,890 a year."  Hartman omitted material information that PPCN's single largest investment had been lost in foreclosure and PPCN was facing catastrophic losses in connection with its investment in Melrose Holdings.

91.     For example, on or about early 2015, Hartman sent a potential investor the PPM dated 2010 and other information about PPCN, and the investor purchased a promissory note from PPCN in or about February 2015.  The investor and the investor's spouse made additional investments in PPCN in September 2015, and October 2015.  Hartman made the following material misrepresentations, and omitted to disclose the following material information, to those investors in connection with the offer and sale of the PPCN promissory note:

(a)     Prior to the investor's purchase in February 2015, Hartman provided a document purporting to provide a side-by-side comparison of compounding of PPCN compared to the S&P 500, which showed that PPCN earned 12.5% per year and substantially outperformed the S&P 500.  The side-by-side comparison was materially misleading because PPCN did not earn 12.5% per year prior to January 1, 2014, and omitted material information concerning that PPCN was facing catastrophic losses on its investment in Melrose Resort.

(b)     Prior to the investor's purchase in February 2015, Hartman provided information about prior PPCN projects, and specifically a "Shiloh" investment, and falsely claimed that it had paid off profitably, when in fact that project was not successful.  Hartman omitted material information that the Shiloh loan included a $1.3 million loss from the Deer Crest loan and PPCN then gave up its interest in the Shiloh project in return for its interest in Melrose Holdings.

(c)     Prior to the investor's purchase in February 2015, Hartman failed to disclose material information about the dire financial condition of Melrose Resort; the October 2013 tax sale

of a portion of the Melrose Resort property; the November 2013 foreclosure filing by the Senior

Lender on the Melrose Resort property; the April 2014 judgment for $27 million obtained by the

Senior Lender in the foreclosure action; the defaults and forbearance agreements on the Mezz II

Loan and North Shore Loan; and that PPCN was facing catastrophic losses on its investment in the

Melrose Resort.

        (d)     In connection with the investor's additional investment in September 2015,

Hartman failed to disclose additional material information that he had lost ownership of PPCN

through the defaults and forbearance agreements on the Mezz II Loan and North Shore Loan, and

that Hartman had signed a personal guarantee for the Mezz II Loan and North Shore Loan which he

could not honor or pay.

        (e)     In connection with the investor's additional investment in October 2015,

Hartman again failed to disclose any of the material information alleged above in this paragraph.

### ii.      The SME misrepresentations and omissions

92.     In early 2015, negative information about PPCN entered the public domain.  On

March 12, 2015, a receiver appointed in the action captioned *SEC v. Total Wealth Management,*

*Inc., et al.*, Case No. 3:15-cv-00226-BAS-DHB (S.D. Cal.), filed a report which stated that PPCN

had "limited resources and holdings which do not appear to have been sufficient to generate the

substantial interest payments made by the entity, including interest[] payments made in cash," and

PPCN owed investors in Total Wealth Management over $30 million.  On or about July 14, 2015,

the receiver for Total Wealth Management made a demand on PPCN for repayment of $30 million

of notes that had been issued five years previously.  PPCN never responded to that demand for

payment.

93.     Around this time in 2015, Hartman transitioned from using PPCN to raise funds

from investors, and began raising money by issuing "balloon promissory notes" from SME to

investors who were providing funds for the Melrose Resort.

94.     In January 2015, Hartman opened a bank account in the name of SME.  Throughout 2015, Hartman transferred investor funds between the PPCN and SME bank accounts.

95.     Beginning in 2015 through mid-2017, in connection with the offer and sale of the SME promissory notes to investors, Hartman made material misrepresentations to investors that the Melrose Resort was a successful enterprise, and that the Senior Lender had placed restrictions on the development of Melrose Resort.  Hartman omitted material information concerning the dire financial condition of the Melrose Resort, the foreclosure action filed in November 2014, the judgment for over $27 million entered in the foreclosure action in April 2015, and the October 2014 tax sale of the property, PPCN's loss of any interest in Melrose Holdings, and after May 2015, Hartman's loss of his ownership interests in PPCN and SME.

96.     Hartman made these material misrepresentations and omissions to prospective SME investors on a regular basis in the course of communicating with investors in an effort to convince them to invest and at or around the time each of them invested.  Hartman made these misrepresentations and omissions both verbally and in written materials. Examples of these misrepresentations and omissions include the following:

97.     For example, in or about February 2015, Hartman solicited an investor and sold the investor a $1 million "balloon promissory note" issued by SME, with an interest rate of 9%, interim interest payments due on July 15, 2015 and December 15, 2015, and the principal and final interest payment due on February 28, 2016.  In connection with the offer and sale of this note, Hartman made the material misrepresentations that all of the investor's funds would be used for the Melrose Resort, and omitted to disclose the material information that the Senior Lender had initiated a foreclosure proceeding in November 2013, that the property had been sold in a tax sale in October

2013, and that the Senior Lender had obtained a judgment in foreclosure in April 2014 in the amount of $27 million.

98.     For example, in or about August, 2015, Hartman issued and signed a "balloon promissory note" from SME to an investor in the amount of $100,000, with an interest rate of 16% and monthly interest payments of $1,333.33, with the principal to be paid off upon "closing of our Daufuskie private equity joint venture partner . . . within 90 days of the date of this Note."  In connection with the offer and sale of this note, Hartman omitted to disclose material information concerning the default and forbearance agreements on the Mezz II Loan and North Shore Loan, and his loss of any interest in PPCN, SME, and Melrose Holdings as of May 2015; the April 2014 judgment in the foreclosure action in excess of $27 million; and that the Melrose Resort was in dire financial condition.

99.     For example, on or about October 26, 2015, Hartman issued and signed a "balloon promissory note" from SME to an investor in the amount of $175,000, with an interest rate of 11% and monthly interest payments of $1,604.16, with the principal due "within 12 months of the date of this Note."  The investor had previously invested in PPCN, and had received a statement from PPCN showing interest accrued in the amount of $10,178.33 on a principal balance of $164,202.85, over the six month period from January 1, 2015 through June 30, 2015.  In connection with the offer and sale of this note, Hartman and PPCN falsely represented that PPCN was earning income sufficient to pay the accrued interest, and omitted material information that PPCN was facing catastrophic losses on its investment in Melrose Resort because of the April 2014 judgment in foreclosure in excess of $27 million.  In addition, Hartman failed to disclose material information about the defaults and forbearance agreements on the Mezz II Loan and North Shore Loan, and that in May 2015 he had lost any ownership interest in PPCN, SME, and Melrose Holdings.

**b.      Bramlette made material misrepresentations, and omitted to disclose material facts, while raising over $1.8 million from investors**

100.      From January 2015 through March 2017, Bramlette raised at least $1.8 million from at least 10 investors through the offer and sale of promissory notes and "short term bridge" notes which he represented were to provide funds for the development of the Melrose Resort.

101.      Bramlette solicited investors through meetings at the Pelorus office, through telephone calls, and email communications.  Among the investors solicited directly by Bramlette were individuals who had originally invested through Hartman and Kozlowski.

102.      Bramlette, through Pelorus and other entities associated with Melrose Resort, issued short-term promissory notes to investors which promised high rates of return, such as 24% per year.

103.      In connection with the offer and sale of the promissory notes, Bramlette falsely represented that the funds would be spent on improvements to the Melrose Resort, and omitted to disclose material information that the funds would be used to pay his personal expenses and to pay earlier investors; that he had lost the ownership of Melrose Resort in a foreclosure action resulting in a $27 million judgment; and that a portion of the Melrose Resort had been sold in a tax sale.

104.      In connection with the offer and sale of some of the promissory notes, Bramlette signed personal guarantees for some of these investors, but omitted material information that he did not have the personal resources to repay any of the loans; and material information that he had defaulted on his personal guarantees on the Mezz II Loan and North Shore Loan resulting in a $3,994,885 judgment against Bramlette and Hartman entered on December 17, 2015.

105.      In connection with the offer and sale of the promissory notes, Bramlette falsely represented that investors would be paid high rates of interest, and omitted to disclose material information that the Melrose Resort was not generating sufficient revenue to pay its bills; and that there was no source of funds to pay the high interest rates or repay the short term loans.

106.    Bramlette made these material misrepresentations and omissions to prospective investors on a regular basis in the course of communicating with investors in an effort to convince them to invest, at or around the time each of them invested.  Bramlette made these misrepresentations and omissions both verbally and in written materials.  Examples of these misrepresentations and omissions include the following:

107.    For example, on or about August 26, 2015, Bramlette obtained $280,000 from an investor, evidenced by two "short term bridges notes" in the amounts of $200,000 and $80,000, which were due and payable on November 26, 2015.  The note for $200,000 provided for a "fee" of $20,000 to be paid in addition to the principal, and the note for $80,000 provided for a "fee" of $10,000 to be paid in addition to the principal.  The borrowers were Pelorus and Melrose Holdings, and Bramlette executed each note on behalf of both borrowers.

(a)    Each of the notes expressly and falsely represented that there "are no actions, suits or proceedings at law or in equity . . . now pending, filed or, to such Borrower's knowledge, threatened against or affecting any Borrower," and Bramlette failed to disclose material information that all of the properties in which Melrose Holdings had an interest and which make up the Melrose Resort had been subject to a foreclosure action and judgment entered in April 2014.

(b)    Each of the notes expressly and falsely represented that the borrowers, Pelorus and Melrose Holdings, had "authority to transact business in which it is now engaged," and Bramlette failed to disclose material information that as of May 2015 Bramlette had lost all ownership interest in Melrose Holdings and Pelorus and did not have any authority to enter into contracts on behalf of those entities.

(c)    Each of the notes expressly represented that the borrowers' assets do not " constitute unreasonably small capital to carry out its business as conducted or as proposed to be

conducted," and that borrowers do not intend to incur debt and liabilities "beyond their ability to pay such debt and liabilities as they mature," and Bramlette failed to disclose that Pelorus and Melrose Holdings were subject to substantial liabilities as a result of the Mezz II Loan and North Shore Loan which the borrowers could not repay, or that the Melrose Resort was not generating sufficient income to pay its bills, or that Pelorus and Melrose Holdings did not have the ability to repay the loans.

108.    For example, on or about September 25, 2015, Bramlette obtained $550,000 from an investor, evidenced by a "short term bridge note" in the amount of $550,000, which was due and payable on December 25, 2015, and carried an interest rate of "12% fee."  The borrowers were Pelorus and Melrose Holdings, and Bramlette executed each note on behalf of both borrowers.

(a)    The note expressly and falsely represented that there "are no actions, suits or proceedings at law or in equity . . . now pending, filed or, to such Borrower's knowledge, threatened against or affecting any Borrower," and Bramlette failed to disclose material information that all of the properties in which Melrose Holdings had an interest and which make up the Melrose Resort had been subject to a foreclosure action and judgment entered in April 2014.

(b)    The note expressly and falsely represented that the borrowers, Pelorus and Melrose Holdings, had "authority to transact business in which it is now engaged," and Bramlette failed to disclose material information that as of May 2015 Bramlette had lost all ownership interest in Melrose Holdings and Pelorus and did not have any authority to enter into contracts on behalf of those entities.

(c)    The note expressly represented that the borrowers' assets do not " constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted," and that borrowers do not intend to incur debt and liabilities "beyond their ability to pay such debt

and liabilities as they mature," and Bramlette failed to disclose that Pelorus and Melrose Holdings were subject to substantial liabilities as a result of the Mezz II Loan and North Shore Loan which the borrowers could not repay, or that the Melrose Resort was not generating sufficient income to pay its bills, or that Pelorus and Melrose Holdings did not have the ability to repay the loans.

109.    For example, on or about April 1, 2016, Bramlette obtained $100,000 from an investor, evidenced by a bridge note in the amount of $100,000, which was due and payable on August 1, 2016, carried an annual interest rate of 24%, and if not paid on October 1, 2016, then the interest rate defaulted to 34%.  The borrower was an entity named Melrose Restaurants, LLC, and Bramlette executed the note as the Managing Partner of the borrower.  In addition, Bramlette, Kozlowski, and Wernli executed a "guaranty" in which they "unconditionally and jointly and severally guarantee[] the payment, when due."

(a)    Bramlette verbally told the investor that he needed short-term financing to pay for operational expenses at Melrose Resort while he was in the process of obtaining a refinancing from a large lender, that the loan would be repaid from the proceeds of the refinancing, and that he was going to transform Melrose Resort into a major resort destination.

(b)    Bramlette failed to tell the investor material information that the Senior Lender had obtained a foreclosure judgment in April 2014 on all of the properties of the Melrose Resort in excess of $27 million; that Bramlette had lost his interests in Pelorus and Melrose Holdings in May 2015 as a result of the default on the Mezz II Loan and the North Shore Loan; that Bramlette was liable for a $3.9 million judgment entered against him and Hartman in December 2015 for their failure to honor their personal guarantees on the Mezz II Loan and North Shore Loan, and that the Melrose Resort was not generating sufficient revenue to pay its bills.

(c)    In connection with the guaranty, Bramlette failed to tell the investor material

information that he had failed to honor his personal guarantee given in connection with the Mezz II Loan and North Shore Loan, which had resulted in a December 2015 judgment against him and Hartman in excess of $3.9 million.

> ### c.   Kozlowski made material misrepresentations, and omitted to disclose material facts, while raising at least $1.8 million from investors through Entelecus

110.    From January 2014 through October 2016, Kozlowski raised at least $1.8 million from at least 12 investors in connection with the issuance and sale of promissory notes by Entelecus and its subsidiaries, for the purpose of investing in the Melrose Resort.

111.    Kozlowski used means and instrumentalities of interstate commerce to solicit investors in the Salt Lake City area, by telephone, by emails, and through in-person meetings.

112.    In an effort to induce investors to purchase promissory notes, Kozlowski and Entelecus promised very high rates of return, including notes that promised 24% in annual returns. In addition, Kozlowski offered very short periods before repayment at high rates of interest, such as notes that were due and payable in 30 days, 48 days, and 60 days.

113.    Kozlowski signed personal guarantees for certain of the investors.

114.    Kozlowski represented to investors that their funds would be invested in the Melrose Resort, which he falsely represented was a successful development which would generate the funds to repay the investors their principal and interest as promised.

115.    Kozlowski omitted to disclose material information to investors that the Melrose Resort was in dire financial condition, was undercapitalized, did not have any revenue sources, and could not pay its bills.

116.    Kozlowski omitted to disclose material information that in November 2013, the Senior Lender sought to have a receiver appointed because the property was in poor condition and initiated a foreclosure action.

117.     Kozlowski sold and issued promissory notes in the name of Melrose Resort Group, LLC, which he co-signed with Bramlette, which falsely stated that payment was going to come from the cash flow of Melrose Resort and was secured by real property on Daufuskie Island. Kozlowski omitted to disclose to investors that they did not have a secured position on real estate, or that he knew it was not possible to give these investors a secured position because the there was a prohibition on second liens in the first mortgage documents.  Kozlowski knew that these were unsecured loans, but failed to disclose that to investors.

118.     Kozlowski promised investors a high rate of return, but failed to disclose that given the dire financial condition of the Melrose Resort, it was not possible to generate the money to pay such returns.

119.     Kozlowski made these material misrepresentations and omissions to prospective investors on a regular basis in the course of communicating with investors in an effort to convince them to invest and at or around the time each of them invested.  Kozlowski made these misrepresentations and omissions both verbally and in written materials.  Examples of these misrepresentations and omissions include the following:

120.     For example, on or about July 18, 2014, Kozlowski co-signed a "promissory agreement" with Bramlette on behalf of Melrose Resort Group, in the amount of $75,000, to an investor in Arizona, in which they agreed to repay the original loan amount within sixty days, plus interest in the amount of $25,000.  The promissory agreement represented that Kozlowski, Melrose Resort Group, and Bramlette "will ensure full payment ... from the cash flow from their personal interest in Melrose Resort Group," but omitted material information about the dire financial condition of Melrose Resort, and the April 2014 foreclosure judgment in excess of $27 million. The promissory agreement also falsely represented that there was a "secured interest in certain

parcels of real property located on Daufuskie Island in South Carolina," but omitted material information about the April 2014 foreclosure judgment. On or about August 1, 2014, Kozlowski co-signed another "promissory agreement" to the same investor, in the amount of $30,000, to be repaid in full in 48 days with interest of $5,000 and which made the same misrepresentations, and omitted the same material information.

121.    For example, on or about April 1, 2016, Kozlowski obtained $100,000 from an investor in return for a "bridge note" issued by Melrose Restaurants, with an interest rate of 24% and a due date of August 1, 2016, for the purpose of providing funds for the Melrose Resort. In connection with the offer and sale of that note, Kozlowski failed to disclose material information that the Melrose Resort was in dire financial condition; the Senior Lender had obtained a $27 million judgment in foreclosure; or that Kozlowski's business partner, Bramlette, had lost all interest in Melrose Holdings in 2015.

122.    In addition, Kozlowski has admitted that he obtained funds from investors that he used for the Melrose Resort, but for which he cannot produce any promissory note or other writing.

123.    After October 2015, Kozlowski continued to issue promissory notes that falsely stated that they were secured by certain subsidiaries of Entelecus. Kozlowski omitted to disclose material information that Entelecus no longer owned the subsidiaries, and that Kozlowski had no authority to enter into any binding agreements for the companies that he no longer owned.

### d.    Wernli made material misrepresentations, and omitted to disclose material facts, while raising about $425,000 from investors

124.    In 2016, Wernli, working with Bramlette, raised about $425,000 from two investors for the purpose of investing in the Melrose Resort.

125.    Wernli did not solicit investors directly, but he signed at least two promissory notes and at least two personal guarantees issued to investors for the purpose of investing in the Melrose

Resort.

126.    Wernli omitted to disclose material information that he did not have the ability to repay the notes or honor the guarantees.  Wernli also failed to disclose that at the time he signed the notes and guarantees, Bramlette had lost all ownership interests in Melrose Resort and Pelorus.

### 2.    Defendants Perpetrated a Fraudulent Scheme to Raise Money From Investors Using the Melrose Resort

127.    By no later than January 2014, Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli were all active participants in a fraudulent scheme of soliciting and raising money from investors, and deceiving those investors about the progress and finances of the Melrose Resort.

128.    In addition to the misrepresentations and omissions made to investors as alleged above, each of the Defendants took numerous additional steps in furtherance of the scheme to defraud.  These acts include both written and verbal communications to investors which falsely portrayed the financial condition and success of the Melrose Resort, for the purpose of lulling the investors and deceiving investors concerning the safety and performance of their investments. These acts also included efforts to forestall a foreclosure sale, subsequent misrepresentations to conceal the catastrophic losses suffered by investors as a consequence of the Defendants' fraud, and misappropriation of investors' funds.

129.    Defendants carried out their fraudulent scheme through a variety of types of deceptive conduct, including, among other things, providing investors with false progress reports; Defendant Hartman issuing false and misleading PPCN account statements; Defendants Pelorus, Hartman, PPCN, SME, and Kozlowski making Ponzi-like payments to investors; providing investors with false information during visits to the Melrose Resort; securing forbearance agreements with lenders to make it appear Defendants were still in charge; and Defendant Hartman

lulling investors with false reports about the progress of the Melrose Resort.  Defendants Bramlette, Hartman, and Kozlowski also misappropriated investor money.

130.    Throughout the period from January 2014 through mid-2017, Bramlette acted as the "operating partner" of the Melrose Resort, and in that role met with Hartman's and Kozlowski's investors to provide "updates on the project," and provided email communications purporting to report progress on the development, which gave the Melrose Resort project credibility as a viable project.  These updates misrepresented the dire financial condition of the property, and omitted any discussion of the defaults to the Senior Lender, or other loans and defaults.

131.    Hartman and PPCN issued semi-annual account statements to investors in PPCN for the periods January to June 2014; July to December 2014; and January to June 2015, which reported that accounts had earned 12.5% interest on the principal amount invested during each period, thus lulling the investors with false information that PPCN was performing as promised.  In fact, the October 2013 tax sale and November 2013 foreclosure action were material events that substantially impaired any interest PPCN had in the Melrose Resort, and PPCN did not have any source of income to pay the reported returns, or repay the promissory notes that had been issued to investors.

132.    During the period after January 2014 through mid-2015, for investors in PPCN who did not agree to re-invest their interest payments, Hartman caused PPCN to issue checks to the investors for their interest, although PPCN did not have income from its investments to make the payments.  Hartman used funds raised from investors to make Ponzi-like payments to some PPCN investors, to create the false appearance that PPCN was performing as represented.

133.    In or about October 2014, Spring 2015, and March 2016, some of Hartman's investors visited Daufuskie Island, where they stayed in cottages that were not owned by the Melrose Resort and which were in good repair.  Bramlette met with the investors and gave them

tours of the island, and Bramlette and Hartman misled the investors to believe that the cottages had been renovated by and were part of the Melrose Resort properties, when in fact they were not.

134.    In an effort to create the false appearance of progress on the project, after the $27 million judgment was entered in the foreclosure action in April 2014, Bramlette negotiated with the Senior Lender to forbear from a foreclosure sale, which allowed Bramlette to continue to hold himself and Melrose Holdings out as the developers of the project, so that Defendants could solicit additional funds from investors, and Hartman and PPCN could issue financial statements and reports to investors that falsely showed the Melrose Resort as a valuable asset.

135.    In October 2014, Bramlette and Hartman negotiated the Mezz II Loan, which provided funds to pay the Senior Lender for a short period of time and avoid any foreclosure sale, thus allowing Defendants to continue to raise money from investors under the guise of developing the Melrose Resort.  To obtain the loan, Bramlette and PPCN transferred all their right, title, and interest in Melrose Holdings to the lender subject to redemption if they paid the loan in full, provided personal guarantees, and pledged other assets in which they had an interest.

136.    In January 2015, and again in April 2015, in an effort to continue to conceal from investors and potential investors the dire financial condition of the Melrose Resort, Bramlette and Hartman negotiated with the Mezz II lenders to forbear from declaring a default.  In the April 2015 agreement, Bramlette assigned ownership of Pelorus to the lenders if payment was not made in May 2015, and Hartman assigned ownership of PPCN and SME if payment was not in May 2015.  The forbearance agreements allowed Defendants to continue raise additional money from investors for the Melrose Resort, and allowed Defendants to avoid informing their investors of their loss of the property.

137.    Beginning in January 2014 at least through mid-2015, Hartman provided false

information to PPCN's accountant in connection with the preparation of financial statements for

PPCN, and did not disclose to the accountant the financial problems with the Melrose Resort, the

foreclosure action filed by the Senior Lender, or the default on the Mezz II Loan.  Hartman falsely

informed PPCN's accountant that the investment in the Melrose Resort had a value of over $38

million for the purposes of PPCN's financial statements, so that it falsely appeared that there were

sufficient funds to pay the notes owed to PPCN investors.

138.    Beginning in early 2015, Hartman communicated with PPCN investors an offer to

"convert" their PPCN promissory notes into an equity investment in PPCN.  In written

communications with investors, Hartman claimed that he had "run the numbers" and given the "big

upside on the Melrose Resort," he would "be able to improve the rate of return by one to three

percentage points" if investors converted their promissory notes to an equity position.  In seeking to

obtain these conversions from investors, Hartman failed to disclose to any PPCN investors the dire

financial condition of the Melrose Resort, the $27 million foreclosure judgment, or any other

relevant, material information concerning the actual financial condition of PPCN or the Melrose

Resort.

139.    Also in 2015, in an effort to conceal the financial disaster which was the Melrose

Resort, Hartman offered some PPCN investors the opportunity to jump to the "head of the line for

repayment," on the condition that investors agree to accept a "significant discount" of

approximately 50% of the amount owed to them by PPCN.  While some investors accepted this

offer, Hartman and PPCN did not have the funds to pay investors even at the discounted pay-off.

140.    In 2015 and early 2016, Hartman used funds raised from SME investors to make

Ponzi-like payments of interest to earlier SME investors, in an effort to mislead the investors to

enable him to solicit additional investments, and to lull investors into believing that everything was

safe and secure.

141.     As late as March 2016, Hartman provided a written update to at least one investor, which touted a purported private equity deal and claimed that "our team now owns and controls the Jack Nicholas [sic] Golf Course, beach club, beach front cottages, restaurant, hotel (rehab plan in process), equestrian center, convention center (for weddings and corporate retreats), marina/ferry system, golf and resort equipment and tractors, and about 450 buildable residential lots that surround the resort." Hartman omitted material information about the foreclosure action and judgment, material information about his loss of his ownership interest in PPCN and its loss of its ownership interest in Melrose Holdings in 2015, and the catastrophic losses facing PPCN note holders because of the failure of the Melrose Resort. In fact, at the time Hartman wrote this in March 2016, he had been presented in June 2015 with a demand for repayment of $30 million of PPCN notes by the receiver appointed in *SEC v. Total Wealth Management, Inc., et al.*, Case No. 3:15-cv-00226-BAS-DHB (S.D. Cal.). PPCN and Hartman failed to respond to that demand or make payment, causing a complete loss for the individuals who invested in PPCN through Total Wealth Management.

142.     As late as February 2017, Hartman was communicating with PPCN and SME investors about a refinance of the Daufuskie properties.

143.     After Bramlette, Hartman, and Kozlowski each lost control of their respective companies, and the Melrose Resort, they continued to execute promissory notes on behalf of those companies, even though they had signed away their ownership and control.

144.     In March 2017, one of the lenders placed all of the entities associated with the Melrose Resort into Chapter 11 bankruptcy. When investors learned about the bankruptcy and questioned the Defendants, in furtherance of the scheme, Bramlette, Hartman, Kozlowski, and

Wernli lulled the investors by claiming that the bankruptcy was a positive development that would remove the liens held by the Senior Lender from the project and enable them to refinance.  In fact, PPCN was not listed in the bankruptcy papers as having any interest or claim to any of the Melrose Resort properties or entities, and the bankruptcy filing was done by lenders who had taken control of the entities, although Bramlette signed the filings.

145.    After the Melrose Resort was sold on September 22, 2017 to the Senior Lender for a credit bid, Bramlette, Hartman, and Kozlowski continued their efforts to deceive investors. Bramlette, Hartman, and Kozlowski claimed that they were in the process of re-purchasing the Melrose Resort and that all investors would be repaid shortly through the Melrose Resort project, as well as another project, the Regent Street Hotel, although Bramlette did not have any ownership interest in that project.

146.    During the entire period from January 2014 through mid-2017, Bramlette directed that the funds raised by Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli were to be transferred to the Pelorus account, rather than going directly to the Melrose Holdings account or other Melrose Resort accounts, although there was no business reason to run all of the funds through the Pelorus account.  The movement of investor funds through multiple accounts helped obscure the sources and uses of funds, and facilitated the fraudulent scheme.

147.    As part of the scheme, Bramlette misappropriated investor funds deposited into the Pelorus account to pay his personal expenses.  Bramlette used investor funds to pay for trips to Disneyland, and the Wynn and Bellagio hotels in Las Vegas; to pay for purchases at luxury shops such as Hermes in Beverly Hills, Ralph Lauren, Marc Jacobs, and Nordstrom; and to pay for a Land Rover automobile.  From January 2014 through mid-2017, Bramlette misappropriated at least $1.5 million of investors' funds to pay for his lavish personal lifestyle.

148.     As part of the scheme, Hartman misappropriated investors' funds deposited into the PPCN and SME accounts to pay his personal expenses.  In an effort to conceal his fraud, Hartman disguised his misappropriation as "management fees" paid to another entity he owned and controlled named Mark Private Equity, LLC, located in Texas.  From January 2014 through March 2016, Hartman misappropriated at least $456,000 of investors' money to pay his personal expenses.  During this period, PPCN did not have any earnings, and its loss on the Melrose Resort meant it had virtually no assets, so Hartman was not entitled to any management fees from PPCN.

149.     As part of the scheme, from January 2014 through May 2017, Kozlowski misappropriated at least $214,000 of investors' money to pay his personal expenses.

### 3.     Defendants Acted With Scienter, or Were at Least Negligent

150.     Bramlette, Hartman, Kozlowski, and Wernli knew, or were reckless in not knowing, that the Melrose Resort was in dire financial condition, in default on first mortgage loans, went into foreclosure, and was otherwise not financially viable, but nonetheless used the promise of its success to raise funds from investors.

151.     By November 2013, Bramlette, Hartman, Kozlowski, and Wernli knew, or were reckless in not knowing, that the Senior Lender had commenced a foreclosure action on all the properties owned by the Melrose Resort, that the amounts owed exceeded $25 million, and that the foreclosure action and amounts eliminated any interests they had in the mortgaged properties.  No later than April 2014, Bramlette, Hartman, Kozlowski, and Wernli knew that the Senior Lender had obtained a judgment in excess of $27 million in the foreclosure action.

152.     By May 31, 2015, Bramlette, Hartman, Kozlowski, and Wernli knew, or were reckless in not knowing, that Bramlette and PPCN had lost all interests in the Melrose Resort, but they continued to solicit and mislead investors with representations that the Melrose Resort was, and would be, a successful investment.

153.   Bramlette, Hartman, Kozlowski, and Wernli knew, or were reckless in not knowing, that Bramlette was using investor funds to pay for his lavish lifestyle, to the detriment of the investors' interests.

154.   Hartman knew, or was reckless in not knowing, that he was misappropriating investors' funds and using them to pay his personal expenses, contrary to the representations to investors.

155.   Kozlowski knew, or was reckless in not knowing, that he was misappropriating investors' funds and using them to pay his personal expenses, contrary to the representations to investors.

156.   Hartman and Kozlowski each made, caused to be made, or knew of, Ponzi-like payments being made to investors in an effort to lull investors and continue the scheme.

157.   Bramlette, Hartman, Kozlowski, and Wernli knew or were reckless in not knowing that they were offering and issuing notes to investors that were purportedly secured by property or other assets, when in fact they had lost such property and assets, and the notes and promises were just a sham.

158.   Hartman knew or was reckless in not knowing that he was failing to disclose material information to PPCN's accountant about the Melrose Resort, and that the resulting financial statements were false and misleading.

159.   Bramlette knew or was reckless in not knowing that he had purchased the properties that made up the Melrose Resort at inflated prices through transactions with related parties, and thus encumbered the properties in excess of their value at the outset.

160.   Bramlette, Hartman, Kozlowski, and Wernli did not exercise reasonable care in communicating with investors, misrepresented the facts about the Melrose Resort, and omitted to

disclose material information to investors.  Bramlette, Hartman, Kozlowski, and Wernli failed to exercise reasonable care in communicating with investors, and by breaching that duty provided false and misleading information about the Melrose Resort's status to investors.

161.    Hartman's state of mind and lack of reasonable care are imputed to the entities he owned and controlled, specifically PPCN and SME.

162.    Bramlette's state of mind and lack of reasonable care are imputed to the entities he owned and controlled, specifically Pelorus.

163.    Kozlowski's state of mind a imputed to the entities he owned and controlled, specifically Entelecus.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities
Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
(against Defendants Bramlette, Pelorus, Hartman, PPCN, SME,
Kozlowski, Entelecus, and Wernli)**

164.    The SEC realleges and incorporates by reference paragraphs 1 through 175 above.

165.    By engaging in the conduct described above, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli engaged in a scheme to defraud investors by falsely portraying the Melrose Resort as a successful project, when in fact the Defendants knew that the Melrose Resort was in dire financial condition, had been foreclosed upon, and Defendants had lost any interest in Melrose Holdings.

166.    By engaging in the conduct described above, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus,  and Wernli, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  employed devices, schemes, or artifices to defraud (Rule 10b-5(a)); and engaged in acts, practices, or courses

of business which operated or would operate as a fraud or deceit upon other persons (Rule 10b-5(c)).

167.    Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli with scienter, employed devices, schemes and artifice to defraud, and engaged in acts, practices, or courses of conduct that operated as a fraud by the conduct described in detail above.

168.    By engaging in the conduct described above, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities
Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
(against Defendants Bramlette, Pelorus, Hartman, PPCN, SME,
Kozlowski, Entelecus, and Wernli)**

169.    The SEC realleges and incorporates by reference paragraphs 1 through 175 above.

170.    By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli each made false statements to investors in connection with the offer and sale of securities in the form of promissory notes secured by, or for the purpose of financing, the Melrose Resort, and omitted to disclose material information about the dire financial condition of the Melrose Resort, the foreclosure action, and Defendants' loss of any interest in Melrose Holdings.

171.    By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  made untrue

statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (Rule 10b-5(b)).

172.    Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

173.    By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act**
**(against Defendant Bramlette, Pelorus, Hartman, PPCN, SME,**
**Kozlowski, Entelecus, and Wernli)**

174.    The SEC realleges and incorporates by reference paragraphs 1 through 175 above.

175.    By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, engaged in a scheme to defraud investors by falsely portraying the Melrose Resort as a successful project, when in fact the Defendants knew that the Melrose Resort was in dire financial condition, had been foreclosed upon, and Defendants had lost any interest in Melrose Holdings.

176.    By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  employed

devices, schemes, or artifices to defraud; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

177.     Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, with scienter or negligence, employed devices, schemes and artifice to defraud, and engaged in acts, practices, or courses of conduct that operated as a fraud by the conduct described in detail above

178.     By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**
**Violations of Sections 17(a)(2) of the Securities Act**
**(against Defendant Bramlette, Pelorus, Hartman, PPCN, SME,**
**Kozlowski, and Entelecus)**

179.     The SEC realleges and incorporates by reference paragraphs 1 through 167 above.

180.     By engaging in the conduct described above, Defendant Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, and Entelecus each obtained money or property by means of false statements to investors in connection with the offer and sale of securities in the form of promissory notes secured by, or for the purpose of financing, the Melrose Resort, and omitted to disclose material information about the dire financial condition of the Melrose Resort, the foreclosure action, and Defendants' loss of any interest in Melrose Holdings.  Defendants obtained money or property in the form of more than $10.8 million they collectively raised from investors, and defendants Bramlette, Hartman and Kozlowski received monies they misappropriated from investors.

181.     By engaging in the conduct described above, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, and Entelecus, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or

45

communication in interstate commerce or by use of the mails directly or indirectly, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.    Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, and Entelecus, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183.    By engaging in the conduct described above, Defendants Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Bramlette, Pelorus, Hartman, PPCN, SME, Kozlowski, Entelecus, and Wernli, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**IV.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  September 26, 2018

_____
Amy J. Oliver
John B. Bulgozdy
Teri Melson
Attorneys for Plaintiff
Securities and Exchange Commission