## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JAMES THOMAS BRAMLETTE; THE PELORUS GROUP, LLC; ANTHONY MARK HARTMAN; PRIVATE PLACEMENT CAPITAL NOTES II, LLC; STONE MOUNTAIN EQUITIES, LLC; TRAVIS KOZLOWSKI; ENTELECUS FUND, LLC; AARON JOHN WERNLI,<br><br>Defendants. | **ORDER VACATING ORDER SETTING ASIDE CIVIL PENALTIES AND REINSTATING PART OF PRIOR ORDER IMPOSING CIVIL PENALTIES AS TO DEFENDANTS ANTHONY MARK HARTMAN, PRIVATE PLACEMENT CAPITAL NOTES II, LLC, AND STONE MOUNTAIN EQUITIES, LLC**<br><br>2:18-cv-00761-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

Earlier this year, Plaintiff Securities and Exchange Commission (SEC) filed a Motion for Final Judgment Ordering: (1) Disgorgement, Prejudgment Interest, and Civil Penalty Against Defendant Anthony Mark Hartman ("Hartman"); and (2) Civil Penalties Against Defendants Private Placement Capital Notes II, LLC ("PPCN") and Stone Mountain Equities, LLC ("SME").[1]  Before receiving any opposition, the court granted the SEC's Motion and entered an Order imposing a judgment and assessing civil penalties against Hartman, PPCN, and SME (Defendants).[2]  In response, these Defendants moved the court to set aside just one part of that Order—Section VII, in which civil penalties were imposed—and to permit them to file briefing opposing the imposition of those penalties.[3]  The court granted the Defendants' Motion, set aside the prior Order's Section VII, and provided a schedule to receive additional briefing from

---

[1] Dkt. 198.

[2] Dkts. 205 (Docket Text Order granting Motion) and 207 (Order Entering Civil Judgment as to Defendants Anthony Mark Hartman, Private Placement Capital Notes II, LLC, and Stone Mountain Equities, LLC).

[3] Dkt. 208.

Defendants and the SEC only on the issue of civil penalties.[4]  The parties have filed their additional briefing.[5]  The civil penalties issue is now ripe for consideration.

Having carefully reviewed the parties' additional briefing and for the reasons discussed below, the court concludes that civil penalties should be imposed upon Defendants in the amounts initially set forth in the prior Order's Section VII: (1) $5,696,753 against Hartman, (2) $2,277,902 against PPCN, and (3) $3,418,851 against SME.  The court will VACATE the Order setting aside the prior Order's Section VII[6] and REINSTATE Section VII in the prior Order[7] with an amended deadline for payment, giving Defendants thirty (30) days from the date of this Order to make these payments, within the procedures otherwise outlined in Section VII.[8]

## BACKGROUND[9]

This case arises out of a complex fraudulent investment scheme in which Hartman and co-Defendants James Thomas Bramlette, Travis Kozlowski, and Aaron John Wernli used the Melrose Resort—a decrepit property located on Daufuskie Island, South Carolina—to solicit investor contributions for the ostensible purpose of funding the resort.[10]  Hartman also used his

---

[4] Dkt. 214.

[5] Dkts. 215 (Defendants' Response and Opposition to Plaintiff's Motion for Civil Penalties), 220 (SEC's Reply with Regard to Civil Penalties), and 221-222 (Declarations provided by the SEC from Cathy Irwin and Ramy Kassabgui).

[6] Dkt. 214

[7] Dkt. 207.

[8] *Id.* at 6-7.

[9] The factual background in this Order is drawn from the SEC's Complaint (Dkt. 2) and the Declaration of Marti P. Murray, a financial industry expert the SEC retained (Dkt. 200).  For the purposes of considering the imposition of civil penalties, the court accepts the allegations as true.  In their Consents to Entry of Final Judgment, the Defendants agreed that for the purposes of a motion related to their Consent or Judgment, "the allegations of the Complaint shall be accepted as and deemed true by the Court," and the court "may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence . . . ."  *See* Dkt. 185 (Consent to Entry of Final Judgment as to Hartman) ¶ 4; Dkt. 188 (Consent to Entry of Final Judgment as to PPCN) ¶ 5; Dkt. 189 (Consent to Entry of final Judgment as to SME) ¶ 5.

[10] Dkt. 2 (Complaint) ¶ 1.

companies, PPCN and SME, to raise money from, and distribute Ponzi-like payments to, investors.[11]

In 2011, Bramlette purchased the Melrose Resort out of bankruptcy, intending to develop and manage the resort properties.[12]  Throughout 2011, Bramlette negotiated three mortgage loan agreements totaling more than $16 million to finance the purchase.[13]  In about October 2012, Bramlette formed Melrose Holdings, allowing PPCN to invest in the Melrose Resort and obtain a minority interest in Melrose Holdings.[14]  By June 2013, the three mortgage loans were declared in default by the Senior Lender.[15]  In October 2013, several of the Melrose Resort properties were sold at a tax sale for failure to pay 2012 property taxes.[16]  In November 2013, the Senior Lender filed an action to foreclose on all the remaining Melrose Resort properties.[17]  In April 2014, the Senior Lender obtained a judgment in foreclosure for over $27 million.[18]  Following negotiations with Bramlette, the Senior Lender agreed to allow Bramlette to continue to manage the Melrose Resort[19] and to hold the foreclosure in abeyance in return for payment of $100,000 per month, which did not go toward principal or interest on the loans.[20]  After multiple attempts by Hartman and the other Defendants to secure enough investor financing and additional loans to support the failing resort, all of the entities associated with the Melrose Resort went into Chapter

---

[11] *Id.* ¶ 2.  Hartman is the founder, sole owner, and manager of PPCN and SME.  *See id.* ¶ 10.

[12] *Id.* ¶ 1.

[13] *See id.* ¶¶ 23–26.

[14] *Id.* ¶¶ 27, 29.

[15] *Id.* ¶ 33.

[16] *Id.* ¶ 38.

[17] *Id.* ¶ 42.

[18] *Id.* ¶ 43.

[19] *Id.* ¶ 44.

[20] *Id.*

11 bankruptcy in March 2017.[21]  On September 22, 2017, the Melrose Resort was sold to the Senior Lender for a credit bid.[22]

From January 2014 through mid-2017, the Defendants collectively raised over $10.8 million from at least sixty investors through the offer and sale of promissory notes, asserting the funds would be used to finance the Melrose Resort's development.[23]  During this time, Hartman specifically raised at least $6.7 million from at least thirty-seven investors through promissory notes issued by PPCN, or its subsidiary, SME.[24]  Hartman falsely told investors that PPCN was earning returns of 12.5% per year and that the Melrose Resort was making progress.[25]  He further encouraged investors to use their IRA and retirement funds to purchase the promissory notes, asserting that the investments in Melrose Resort were "safe."[26]  However, Hartman did not tell potential investors about the resort's dire financial condition, and he omitted material information about the October 2013 tax sale, the November 2013 foreclosure action, and the April 2014 judgment in foreclosure.[27]

Beyond issuing promissory notes to investors through PPCN and SME, in October and November 2014, Hartman also helped secure additional loan agreements to shore up the Melrose Resort, using as guarantees his membership interests in Melrose Holdings, PPCN, SME, and two other entities he owned.[28]  As of May 31, 2015, the loan agreements were not repaid in full, and

---

[21] *Id.* ¶ 144.

[22] *Id.* ¶ 145.

[23] *Id.* ¶ 1.

[24] *Id.* ¶ 71.

[25] *Id.* ¶ 87.

[26] *Id.* ¶ 75.

[27] *See* Dkt. 200 (Murray Dec.) ¶¶ 9–16, 17–22, 34–38, 44–59.

[28] *See* Dkt. 2 ¶¶ 50–53.

Hartman was forced to relinquish all ownership of Melrose Holdings, PPCN, and SME to the lenders.[29]  After May 2015, even though Hartman lost control of PPCN and SME, he continued to execute promissory notes on behalf of those companies but omitted any mention of the loss of his ownership interests.[30]

In June 2015, Hartman was presented with a demand for repayment of $30 million of PPCN notes from a court-appointed receiver in another unrelated investment scheme.[31]  Hartman and PPCN failed to respond to the demand or make any payment, causing a complete loss for the investors in the unrelated case.[32]  Following the receiver's demand, Hartman began using SME to solicit investment for the Melrose Resort.[33]  After May 31, 2015, Hartman continued to raise $1.4 million by issuing and selling promissory notes through SME.[34]

Throughout the scheme, Hartman continuously issued false and misleading PPCN account statements and false progress reports to investors regarding the Melrose Resort.[35]  From January 2014 to mid-2015, Hartman also used funds raised from new investors to cause PPCN to issue checks and make Ponzi-like payments to other PPCN investors for their promised interest payments, creating the false impression that PPCN was performing as promised.[36]  And from

---

[29] See id. ¶¶ 51–55.

[30] Id. ¶¶ 95, 143.

[31] Id. ¶ 141.  See also SEC v. Total Wealth Management, Inc., et al., Case No. 3:15-cv-00226-BAS-DHB (S.D. Cal.).

[32] Dkt. 2 ¶ 141.

[33] See Dkt. 198 at 15 (citing Dkt. 221 (Irwin Declaration) ¶ 14).

[34] Id.

[35] Dkt. 2 ¶¶ 129, 131.

[36] Id. ¶ 132.

January 2014 to March 2016, Hartman misappropriated at least $928,992 of investors' money to pay his own personal expenses, disguising the misappropriation as "management fees."[37]

## PROCEDURAL HISTORY

On September 26, 2018, the SEC filed this action against the collective Defendants.[38] In its Complaint, the SEC asserted claims against Hartman, PPCN, and SME under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, and claims under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).[39]

On December 3, 2018, Hartman filed a Motion to Dismiss for Lack of Personal Jurisdiction on behalf of himself, PPCN, and SME.[40] The court denied the motion on April 18, 2019.[41] On May 2, 2019, Hartman answered the Complaint, asserting his Fifth Amendment privilege as to all the SEC's allegations.[42] The same day, PPCN and SME also filed a joint Answer asserting the Fifth Amendment in response to all allegations made against them.[43]

On May 8, 2019, Hartman, PPCN, and SME filed a Motion to Stay Civil Case Pending Outcome of Criminal Proceedings.[44] In connection with the Melrose Resort scheme, Defendants Bramlette, Hartman, and Kozlowski were indicted by a grand jury on April 9, 2019 in the United States District Court for the District of South Carolina on criminal charges, including wire fraud

---

[37] *Id.* ¶ 148; Dkt. 198 at 14 (citing Irwin Dec. ¶ 19).

[38] Dkt. 2.

[39] *See id.* ¶¶ 164–183.

[40] Dkt. 30.

[41] Dkt. 68.

[42] Dkt. 76.

[43] Dkt. 77.

[44] Dkt. 82.

and conspiracy to commit wire fraud.[45]  At a hearing held on July 9, 2019, Magistrate Judge Evelyn Furse denied the Motion to Stay, struck the Answers of PPCN and SME based upon the improper assertion of the Fifth Amendment, and ordered PPCN and SME to file new Answers by July 31, 2019.[46]  PPCN and SME did not comply with the order, and the Clerk of Court entered default against them on August 27, 2019.[47]  On June 22, 2020, the court entered default judgments against PPCN and SME.[48]

On September 29, 2020, PPCN and SME moved the court to set aside the default judgments.[49]  Before the court could rule on that motion, on December 30, 2020, Hartman filed a Consent to Entry of Final Judgment.[50]  PPCN and SME followed by filing their own Consents to Entry of Final Judgment on January 19, 2021.[51]  The court granted the Consents.[52]

In the Consents, Hartman, PPCN, and SME agreed that the court "shall order a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]," and the amount of the civil penalty "shall be determined by the Court upon motion of the [SEC]."[53]  In addition to agreeing to pay civil penalties, Hartman, PPCN, and SME further agreed that:

> in connection with the SEC's motion for civil penalties, and at any hearing held on on such a motion: (a) Defendant will be precluded from arguing that it did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may

---

[45] *See id.* at 2 ¶ 6.

[46] Dkt. 198 at 4 ¶ 4.

[47] Dkt. 98.

[48] Dkts. 124, 125.

[49] Dkt. 147 (Motion to Set Aside Judgment).

[50] Dkt. 185.

[51] Dkts. 188 (PPCN) and 189 (SME).

[52] *See* Dkts. 186 (Hartman), 190 (PPCN), 191 (SME).

[53] Dkt. 185 ¶ 4 (Hartman); Dkt. 188 ¶ 5 (PPCN); Dkt. 189 ¶ 5 (SME).

not challenge the validity of this Consent or the Judgment; (c) solely for the purposes of this motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.[54]

On January 29, 2021, the SEC filed a Motion for Final Judgment Ordering: (1) Disgorgement, Prejudgment Interest, and Civil Penalty Against Hartman; and (2) Civil Penalties Against Defendants PPCN and SME.[55] The court granted that Motion and entered the judgment on February 10, 2021.[56]  Among other things, the court permanently enjoined Hartman, PPCN, and SME from "directly or indirectly . . . participating in the issuance, purchase, offer, or sale of any security in an unregistered offering" other than for their own personal accounts.[57]  The court also held Defendants liable for disgorgement in the following amounts: (1) Hartman for $5,696,753, (2) PPCN for $2,277,902, and (3) SME for $3,418,851.[58]  And finally, the court assessed civil penalties against in the following amounts: (1) Hartman for $5,696,753, (2) PPCN for $2,277,902, and (3) SME for $3,418,851.[59]

But on February 15, 2021, those Defendants moved to set aside Section VII of that Order, in which the specific civil penalties were imposed, and for permission to file briefing opposing their imposition.[60]  The court granted the Defendants' Motion and set aside Section VII.  It

---

[54] *Id.*

[55] Dkt. 198.

[56] Dkt. 207.

[57] *Id.* at 3.

[58] *Id.* at 4.

[59] *Id.* at 6.

[60] Dkt. 208.

further permitted additional briefing from those Defendants and the SEC on the issue of civil penalties,[61] which the parties have filed.[62]

## ANALYSIS

The Exchange Act and Securities Act establish three tiers of civil penalties for securities law violations, with the third tier being the most severe.[63]  A court may order third-tier penalties when the violation: (1) "involved fraud, deceit, manipulation, or reckless disregard of a regulatory requirement," and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."[64]  It is the SEC's burden to make "a proper showing" that the requested penalty is appropriate.[65]  However, "the amount of any civil penalty rests squarely in the discretion of the court"[66] and shall be determined "in light of the facts and circumstances" of the particular case.[67]  When "determining whether to assess civil penalties, a court may consider evidence of a defendant's overall conduct, including conduct that is not directly related to the violations at issue."[68]  A court may issue a penalty equal to "the gross amount of pecuniary gain" each defendant received as a result of the violation.[69]

---

[61] Dkt. 214.

[62] Dkts. 215 (Defendants' Response and Opposition to Plaintiff's Motion for Civil Penalties), 220 (SEC's Reply with Regard to Civil Penalties), and 221-222 (Declarations provided by the SEC from Cathy Irwin and Ramy Kassabgui).

[63] *SEC v. Intelliquis Int'l, Inc.*, No. 2:02-cv-674-PGC, 2003 WL 23356426, at *18 (D. Utah Dec. 11, 2003).

[64] 15 U.S.C. §§ 78u(d)(3)(B)(iii)(aa–bb), 77t(d)(2)(C)(i–ii).

[65] *See id.*

[66] *SEC v. Orr*, No. 11-2251-SAC, 2012 WL 1327786, at *9 (D. Kan. Apr. 17, 2012).

[67] *See* 15 U.S.C. §§ 78u(d)(3)(A)(i), 77t(d)(2).

[68] *SEC v. Smart*, No. 2:09-cv-00224-DAK, 2011 WL 2297659, at *22 (D. Utah June 8, 2011), *aff'd*, 678 F.3d 850 (10th Cir. 2012).

[69] *See* 15 U.S.C. §§ 78u(d)(3)(B)(iii), 77t(d)(2)(C); *see also, e.g.*, *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (ordering a $15,000,000 penalty equal to the disgorgement amount "due to difficulty calculating total number of violations").

The undisputed facts show that Hartman, PPCN, and SME knowingly and actively engaged in a fraudulent investment scheme over a number of years that resulted in millions of dollars in losses to its investors. Accordingly, both requirements for the imposition of third-tier penalties are satisfied.

Civil penalties serve the dual purpose of punishing the individual violator and deterring future violations of the securities laws.[70] Such penalties are necessary because disgorgement merely requires the return of illegal profits; it does not impose an actual economic penalty as a financial deterrent to others who may engage in securities fraud.[71] When determining the appropriate civil penalty, courts consider a number of different factors. Some courts use the five-factor test articulated in *SEC v. Murphy*: "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of the defendant's assurances against future violations."[72] Other courts[73] use a seven-factor test:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

---

[70] *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

[71] *Id.* (citing H.R.Rep. No. 101-616, at 15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384).

[72] *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009) (citing *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)).

[73] *See, e.g.*, *SEC v. Merrill Scott & Assocs., Ltd.*, No. 2:02-cv-39, 2006 WL 3422106, at *4 (D. Utah Nov. 28, 2006); *SEC v. Mantria Corp.*, No. 09-cv-02676-CMA-MJW, 2011 WL 3439348, at *9 (D. Colo. Aug. 5, 2011).

Defendants urge the court to use the seven-factor test outlined above.[74]  Although the SEC addressed the five *Murphy* factors in its initial Motion for Entry of Final Judgment,[75] it noted in its more recent brief on civil penalties that the factors in both tests largely overlap and will not change the analysis provided in the initial Motion.[76]  As such, the court will apply the seven-factor test as Defendants request, taking up each factor in turn.

*(1) The Egregiousness of the Violations at Issue*

The conduct and violations of Hartman, PPCN, and SME were egregious.  As outlined above, Hartman raised millions of dollars from multiple investors without revealing the Melrose Resort's dire financial condition.[77]  Hartman used PPCN to issue promissory notes and falsely claimed that PPCN was earning returns of 12.5% per year.[78]  When PPCN became insolvent, Hartman continued to raise $1.4 million by issuing and selling promissory notes through SME.[79]  Hartman executed promissory notes from both PPCN and SME even after he lost his ownership interests in both companies.[80]  Hartman sent out false account statements to lull investors into thinking the Melrose project was going well.[81]  He also misappropriated investor funds for his own personal expenses.[82]  And finally, Hartman's activities with PPCN and SME are consistent

---

[74] *See* Dkt. 215 at 4.

[75] Dkt. 198.

[76] *See* Dkt. 220 at 3.

[77] *See* Dkt. 200 ¶¶ 9–16, 17–22, 34–38, 44–59.

[78] *See* Dkt. 2 ¶ 87.

[79] *Id.*

[80] *Id.* ¶¶ 95, 143.

[81] *Id.* ¶¶ 2, 129, 131.

[82] *Id.* ¶ 148; Dkt. 198 at 14 (citing Irwin Dec. ¶ 19).

with a Ponzi scheme, and Hartman made Ponzi-like payments to create the false impression that the investment scheme was a success.[83]

### (2) Defendants' Scienter

The term "scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud."[84] "Scienter" encompasses not only knowing or intentional misconduct, "but for purposes of Section 10(b), it also encompasses recklessness, which is conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[85]

The SEC argues the conduct alleged in the Complaint demonstrates a high level of scienter and complete disregard for investors.[86] Defendants respond that although they do not challenge the Complaint's allegations or deny any wrongdoing, they should be allowed to show the SEC "has not provided the whole story."[87] Specifically, they contend their actions throughout the scheme should mitigate their degree of scienter.[88] Along with their recent brief opposing civil penalties, Defendants have provided the court with declarations from some of the scheme's investors. The gist of the declarations is to provide testimonials concerning the blameless nature of Hartman's conduct. The investors describe how Hartman always kept

---

[83] Dkt. 2 ¶ 132.

[84] *Mantria*, 2011 WL 3439348, at *6 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).

[85] *Id.* (internal quotation marks and alteration omitted, citation omitted).

[86] Dkt. 198 at 15.

[87] Dkt. 215 at 5.

[88] *Id.* at 4–5.

investors informed of the Melrose project's challenges and how Hartman was forthcoming about problems and setbacks.[89]

The court concludes these investor declarations merit virtually no weight for two reasons. First, Defendants each agreed that the allegations in the Complaint are deemed true for purposes of this motion.  As such, they cannot argue their actions did not violate the securities laws "with a deliberate or reckless disregard" but rather that they acted in good faith to keep their investors apprised of the problems associated with the Melrose Resort.[90]  The court will not assign any weight to the argument that Hartman did his best to communicate with investors when it is established that he simultaneously withheld from them the material information that, among other things, the Melrose Resort had been the subject of a tax sale and a foreclosure judgment.

Second, the SEC has provided ample evidence that the declarants Defendants selected to provide evidence are friends and former or current business associates of Hartman.[91]  Even if the court had otherwise been inclined to consider select evidence Defendants submitted in tension with facts Defendants essentially conceded, the credible information the SEC supplied leaves the court unable to assign any credibility or weight to the declarations submitted.

Based on the allegations in the Complaint, which Defendants have consented to deem as true, the SEC has established that Defendants acted with a high degree of scienter.  Their conduct was not only knowing and intentional but also an extreme departure from ordinary care, causing investors to be misled through false promises and the omission of material information.

---

[89] *See id.* at 5–6.

[90] *See also Orr*, 2012 WL 1327786, at *10 ("Because the defendants also agreed they could not argue their actions did not violate the securities law as alleged in the complaint, this court will not recognize any argument running amiss of that agreement.").

[91] *See* Dkt. 220 at 5 and accompanying exhibits and expert declarations.

*(3) The Repeated Nature of the Violations*

Defendants' many violations took place over several years and continued even after the foreclosure of the Melrose Resort and the loss of Hartman's ownership interests in Melrose Holdings, PPCN, and SME.  This factor strongly supports significant third-tier penalties.

*(4) Defendants' Failure to Admit to their Wrongdoing*

Defendants state they "have fully resolved the SEC's claims against them by admitting their wrongdoing and fully cooperated with the SEC by entering into the Consents to Entry of Final Judgment."[92]  However, this self-serving characterization is not entirely accurate.  Defendants' Consents were entered "without admitting or denying the allegations of the Complaint," except for the purposes of this Motion.[93]  And as previously discussed under the test's second factor, rather than accept fault for their actions, Defendants have argued their degree of scienter was much lower than alleged and that they did not mislead investors.  Finally, it was not until the SEC expended substantial resources for a forensic accountant to fully brief Hartman's disgorgement obligation that Hartman finally entered into the Consent Agreement and chose not to contest the disgorgement request.[94]  Regarding PPCN and SME, even after Hartman signed the Consents on their behalf, the entities' counsel withheld approval and tried to renegotiate different provisions to which Harman had already agreed, thus delaying the filing of the Consents for nearly a month.[95]

---

[92] Dkt. 215 at 10.

[93] *See* Dkt. 185 ¶¶ 2, 4; Dkt. 188 ¶¶ 3, 5; Dkt. 189 ¶¶ 3, 5.

[94] Dkt. 220 at 2.

[95] *Id.*  Before 2014, Hartman used PPCN to raise over $30 million from funds managed by Total Wealth Management in another investment scheme, which he did not repay when demanded to do so by the court-appointed receiver.  *See* Dkt. 198 at 15.

*(5) Whether Defendants' Conduct Created Substantial Losses or the Risk of Substantial Losses to Other Persons*

From January 2014 through mid-2017, Hartman individually used PPCN and SME to raise at least $6.7 million of investor funds,[96] even though PPCN was insolvent as early as December 31, 2013.[97] Hartman was also instrumental in working to secure additional large-scale loans for the failing Melrose Resort, knowing he and the other Defendants would be unable to repay.[98] Substantial losses were both foreseeable and actualized.

*(6) Defendants' Lack of Cooperation and Honesty with Authorities*

Despite Defendants' assertion that they have fully cooperated with the SEC, any such cooperation has been minimal to nonexistent. Among other things, PPCN and SME failed to answer the Complaint when the court ordered, and thereafter ignored another court Order to make Rule 26(a) disclosures to the SEC—thereby evading their discovery obligations.[99] Hartman also avoided all participation in discovery by asserting his Fifth Amendment privilege to every allegation in the Complaint.[100] And as previously explained under the test's third factor, the SEC was required to engage a forensic accountant to review the Defendants' financial history before Hartman agreed to enter into the Consent Agreements. As the SEC correctly notes, there

---

[96] *See* Dkt. 2 ¶ 71.

[97] *See* Dkt. 198 at 14.

[98] *See* Dkt. 2 ¶¶ 50–53.

[99] Dkt. 220 at 4.

[100] The court draws an adverse inference against Hartman for this assertion of his Fifth Amendment privileges. Hartman's silence and refusal to contest any allegations "is evidence of his acquiescence to the fact that he knowingly and purposely defrauded investors." *Smart*, 2011 WL 2297659, at *19. *See also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.").

is a great difference between backing down in the face of compelling evidence and cooperating with an investigation.[101]

> (7) *Whether the Penalty that Would Otherwise Be Appropriate Should Be Reduced Due to Defendants' Demonstrated Current and Future Financial Condition*

Defendants argue they do not have the capacity to pay large civil penalties. Specifically, Hartman alleges he invested and lost all his own personal wealth in the Melrose Resort, and he now works as a manual laborer for a moving company "because that is the only job he could get."[102] He states he has "minimal income and almost no savings."[103] Regarding PPCN and SME, Hartman merely alleges they have no cash or liquid assets.[104]

Although Defendants are correct in asserting that a defendant's ability to pay civil penalties can be a significant factor for some courts,[105] they fail to acknowledge a key component of this factor: the inability to pay must be clearly demonstrated. Indeed, it is the defendant who "bears the burden of demonstrating that her or his financial condition justifies a reduced fine."[106] Moreover, "inability to pay must be established by a preponderance of the evidence, rather than the plain statement of a defendant[.]"[107]

Here, despite the fact that PPCN and SME are still in business and Hartman is working as the manager for both entities,[108] Defendants have offered no evidence concerning the financial

---

[101] *See* Dkt. 220 at 2.

[102] Dkt. 215 at 9.

[103] *Id.* at 6.

[104] *Id.* at 6, 7.

[105] *See Mantria*, 2011 WL 3439348, at *9 (reducing civil penalties due to Defendant's demonstrated inability to pay); *Orr*, 2012 WL 1327786, at *11–12 (same).

[106] *SEC v. Amerindo Inv. Advisors Inc.*, No. 05 CV 5231-RJS, 2014 WL 2112032, at *13 (S.D.N.Y. May 6, 2014), *aff'd sub nom. SEC v. Amerindo Inv. Advisors*, 639 F. App'x 752 (2d Cir. 2016).

[107] *SEC v. Harris*, No. 3:09-cv-1809-B, 2012 WL 759885, at *5 (N.D. Tex. Mar. 7, 2012).

[108] *See* Dkt. 220 at 7.

resources of PPCN or SME.[109]  With regard to Hartman, Defendants have provided only six months of bank statements from a single account and have failed to provide any list of assets or accounts.[110]  In past financial disclosures—when Defendants were seeking investments or loans—Hartman provided balance sheets to others showing the combined assets and liabilities of Defendants and his own personal net worth.[111]  For example, in the first quarter of 2015, Hartman provided a balance sheet showing a personal net worth of $188 million.[112]  However, when the SEC deposed him concerning the assets on his 2015 balance sheet, Hartman refused to provide responsive answers and stated that he was "uncertain."[113]

Hartman's claims about investing his own wealth in the Melrose Resort are also dubious. Defendants make multiple assertions identifying different cash and property contributions to the Melrose project yet fail to provide credible or sufficient documentation to verify the true source of the funds.[114]

Additionally, Hartman's contention that he is simply an hourly worker at a moving company does not withstand scrutiny.  Hartman testified at his deposition that he has been setting up a digital marketing company and is considering a virtual real estate investment club.[115]  His bank statements also show payments to an internet marketing firm, a video conference firm, and a cryptocurrency company.[116]

---

[109] *See id.* at 6.

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] *Id.* at 7.

[114] *See id.* at 8–9.

[115] *Id.* at 9–10.

[116] *Id.* at 10.

The court finds that Defendants have not met their burden of demonstrating their inability to pay.  Moreover, even if Defendants had proven their inability to pay, this "is at most one factor to be considered in imposing a penalty, and the Court may impose a civil penalty even assuming that [they] are unable to pay."[117]  Considering that the preceding six factors weigh heavily in favor of imposing the full civil penalty requested by the SEC, and the fact that Defendants have been less than forthcoming in providing the necessary financial information to determine their ability to pay, the requested civil penalty is warranted.

In their briefing opposing the imposition of civil penalties, Defendants frequently refer to the requested penalties as "extreme," "disproportionate," "overly punitive," and "extraordinary."[118]  Defendants contend the sanctions already meted—i.e., the permanent injunction against participating in the sale of securities and being criminally charged by the federal government with a felony—are sufficient.  The court disagrees.  The SEC has asked for nothing more than what the Securities and Exchange Acts allow: a penalty equal to "the gross amount of pecuniary gain" each defendant received as a result of the violation.[119]  Moreover, "imposing a civil penalty in addition to disgorgement is not repetitive."[120]  Civil penalties "are not designed to deter future violations by the individual being fined alone, but also to deter violations of securities laws generally."[121]

Defendants engaged in repeated and egregious securities violations with no regard for the unwitting investors who entrusted them with their money.  They have been uncooperative

---

[117] *Harris*, 2012 WL 759885, at *5.

[118] *See, e.g.*, Dkt. 215 at 2, 3, 6, 8, 9, and 10.

[119] *See* 15 U.S.C. §§ 78u(d)(3)(B)(iii), 77t(d)(2)(C).

[120] *SEC v. Milan Grp., Inc.*, 124 F. Supp. 3d 21, 27 (D.D.C. 2015).

[121] *Merrill Scott*, 2006 WL 3422106, at *6; *see also Milan*, 124 F. Supp. at 27 (explaining that the goal of deterrence extends beyond the individual defendants and serves to deter *others* from similar conduct).

throughout the SEC's investigation and have shown little remorse for their actions. When weighing the totality of the factors considered above, the court finds Defendants' actions warrant the imposition of a third-tier penalty against each Defendant equal to that of their respective disgorgement amounts. These penalties are nondischargeable at bankruptcy as they are imposed as punishment and not as compensation for actual pecuniary loss.[122]

## CONCLUSION

For the foregoing reasons, the court concludes third-tier civil penalties are warranted in the amounts initially assessed in Section VII of the court's prior Order Entering Civil Judgment.[123]  Therefore, the court hereby ORDERS:

1.  The Order setting aside Section VII (Dkt. 214) is VACATED;

2.  Section VII in the Order Entering Civil Judgment (Dkt. 207) is REINSTATED with an amended deadline for payment. As provided in Section VII, Defendant Hartman shall pay a civil penalty in the amount of $5,696,753.00; Defendant SME shall pay a civil penalty in the amount of $3,418,851.00; and Defendant PPCN shall pay a civil penalty in the amount of $2,277,902.00. These Defendants shall have thirty (30) days from the date of this Order to make these payments, and they shall do so in the procedures otherwise outlined in Section VII (*Id.* at 6-7).

SO ORDERED this 3rd day of September 2021.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[122] *CMKM Diamonds*, 635 F. Supp. 2d at 1193.

[123] Dkt. 207 at 6-7.